The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Well, welcome, everyone. It is not currently too beastly hot in this courtroom, which is a nice change of pace. We have four cases scheduled for today, and let's just, I guess, get right into it. Our first case is number 226698, Yelizarov v. United States, or I guess United States v. Yelizarov. And I believe Ms. Skelton, you're first. Good morning, Your Honors. May it please the Court. My name is Megan Skelton, arguing this morning on behalf of Stanislav Yelizarov. Mr. Yelizarov had a bystander, not a lawyer, when he was negotiating his plea. His counsel's performance fell far below an objective standard of reasonableness. There's essentially no dispute that his lawyer conducted zero investigation into the bombshell that the government dropped just days before he was set to enter his initial guilty plea. This was clearly not a strategic choice, and the consequences of his inattention are not entitled to a presumption of reasonableness. It is clear that even the government thought that this information would have an impact on whether Mr. Yelizarov wanted to plead guilty or enter the plea that he had. Otherwise, they would not have contacted his defense counsel just days before. Well, what do we make of the fact that Mr. Yelizarov told him to leave it alone? Well, that still is evidence of his conduct falling below an objective standard of reasonableness. Doing what his client said. Well, doing what his client said. Your Honor, I don't think his client actually said leave it alone. He said they can't prove it. They'll never get me. And that's really not something that an objectively reasonable defense counsel should accept. There should at least be some effort to have a second conversation, if not more. It makes perfect sense to have the first conversation, go away, get the information you need, poke around, come back, and at least have another conversation. So do you agree with me that the Sixth Amendment right to counsel is offense-specific? Hasn't the Supreme Court held the Sixth Amendment right to counsel is offense-specific? Yes, certainly it is charge-specific. And do you agree that the Sixth Amendment right to counsel does not attach until the initiation of formal proceedings? Yes. So can we agree that no matter what else is the case, this individual was not Mr. Yelizarov's lawyer in a murder case because Mr. Yelizarov had not been charged with murder and because he had not been appointed to represent Mr. Yelizarov in murder? I will agree with Your Honor to a point on that. However, I don't... Which part? Which point do you agree to? I do agree that he was not his lawyer for the murder case, and of course a different lawyer was. So any deficient performance then has to be in connection with the robbery? Absolutely. And so how is it ineffective in representing someone on a robbery charge who tells you they can't pin this murder on me to not investigate a murder charge in which you're not someone's lawyer? Well, I think that all of the parties agreed, and the judge below certainly did as well, that the consequences of the plea had broader impacts, and of course the Supreme Court said that in Padilla, that the consequences of the plea could be collateral consequences. Well, sure, but that's a case in which... Let's just continue with the robbery example. I'm representing an undocumented person in a robbery prosecution. If they are found guilty of the robbery, it may have immigration consequences. But the conviction on the count for which I represent them will have immigration consequences. But I don't understand how being convicted of robbery has consequences for the homicide charge for which he's not currently charged. Judge Hazen, I don't think it is actually the conviction on robbery that we're talking about. It's the choices that he made with respect to his robbery charges. Because what was going to happen in the murder case, whether he would be convicted or acquitted, or plead guilty or go to trial in the murder case, is a separate question. So I guess that's the part of your other question that I 100% agree with. However, his choices in the robbery case were going to be informed by what's coming down the pike. And those choices include pleading guilty or going to trial. And as Mr. Yalazarov himself said, he had very little to lose. If he had a full understanding of what was happening in the murder case, then different choices could happen in the robbery case. And Waldman was CJA counsel, is that right? That's correct. And the scope of his appointment was only for the robbery? It didn't extend to other potential indictments or crimes? Well, as things go with the CJA appointment, certainly that was what he was appointed for. But, again, this is a situation where everybody agreed that investigating the murder or following up on the prosecutor's information about the murder would have fallen into the robbery appointment. Although there would come a time when it would cross over and require addition. You say everybody agreed that that would fall within, but not everybody agreed, certainly, that the investigation would fall within that appointment. What concerns me is that I can't imagine how an attorney would be willing to accept an appointment as CJA counsel if that appointment was essentially unbounded. When someone accepts an appointment, they accept an appointment for a particular representation. For example, if they were charged with a capital crime and that attorney was outside of the scope of their practice, would they then agree to that appointment? I think not. And that's what you're asking us to find. Again, I agree partially and not fully, Judge Bernhardt. I do agree that accepting an appointment for a Hobbs Act robbery does not mean that you have accepted an appointment if they supersede with capital charges. Of course, you'd need to be capital qualified. You'd need to be learned counsel. But in those situations, usually there's consultation. Here we had Judge Hollander specifically saying to Mr. Waldman, if you had gone to Judge Motz and said, whoa, this bombshell was just dropped, Judge Motz would have either appointed him on that if that was within what he wanted, gotten him counsel. Counsel are appointed for targets regularly. If it was clear that... Under the criminal justice act, they are? They are. I myself have received target appointments. But not because the Sixth Amendment requires that, right? Because there's no Sixth Amendment right to counsel until you're charged. Correct. Fair enough. I mean, personal experience. No, I accept that. Yeah, sure. But your point is that this is like a real estate lawyer that goes and tells somebody they have clear title to a land and doesn't tell them there's a hog rendering plant right next door. Is that right? And you have an obligation to your client to tell them what their risks are. Absolutely. And that's what you're saying didn't happen here. Is that right? Correct. Because his choices about buying that land could not be fully informed. He wasn't able to actually assess his risks, benefits, what he really wanted without knowing what was on the other side of that fence. And what was on the other... He wasn't buying what was on the other side of the fence. That is a separate issue. But could he make his choice about the first purchase without knowing all the information? And when the lawyer... So can I ask you... This just seems like a weird case, right? In the sense of the lawyer's representing him on one set of charges. He potentially gets information about another set of charges. And the question is whether the lawyer... I guess the first question under Strickland is whether the lawyer rendered deficient performance by not investigating the other possible charges. What is your closest case that says that's deficient performance under Strickland? I didn't see any case in your brief that struck me as terribly analogous to this one. Well, I think you're right that this is a weird case and doesn't show up a lot. Most of the plea 2255s are kind of a different context. I think that the D.C. Circuit's Aguiar case is really close where there was clear information that superseding indictment charging successive 924Cs was coming down the pike. I think that's pretty close. I also think it's worth pointing out that when we've got a guilty plea 2255 and we are looking at how that deficient performance impacted the defendant's choices, it's going to trial on the charge that they pled guilty to doesn't necessarily have to be the choice that the lawyer would make or that the appellate court reviewing it would think would be a good idea. It simply has to be a rational choice. So you're pivoting to Strickland prejudice, so I have that same question. So your brief says things might have been different or he might have found some stuff, but you agree for Strickland prejudice. So what in fact happened is that he took this plea deal, right? And Strickland prejudice says I have to have a reasonable probability that the outcome would have been different. And it strikes me that the two other possible outcomes here are he goes to trial. So he rejects the plea and goes to trial. The other possibility, which is adverted to in your brief, is maybe they make a global plea agreement. But it has to be one of those two things, right? I guess you agree there's no such thing as prejudice in the ether. Like the lawyer would have found some stuff, but he still would have pleaded guilty. That's not Strickland prejudice, right? Not in this case. Not in any case. Well, in some cases, the 2255 counsel might have found amazing mitigation evidence. Right, but then that creates the possibility that the underlying proceeding would have reached. Like so capital, like capital stuff where you would have found some amazing mitigation stuff. And if you found that amazing mitigation stuff, the jury might not have given your client the death penalty. Right, right, right. But you agree that there's no such thing as Strickland prejudice in the ether, right? Correct. So what is the best evidence that but for this, the outcome of the proceedings might have been different? Either he would have gone to trial or notwithstanding the fact that the government expressly rejected a global plea agreement, they would have notwithstanding had a global plea agreement. I think the best evidence is, there's two pieces. The first is some of the contemporaneous evidence was the sentencing proceedings on the robbery where defense counsel and Mr. Yelazarov himself were both clearly contemplating that he would be released from prison when he was in his early 50s. So that evinced a lack of understanding that something else was to come. So that's one piece of evidence that relates specifically to the choices that were made. Another is Mr. Yelazarov himself saying, what did I have to lose? And what did he have to lose? If he knew he was going to ultimately be serving 50 years or who knows more because But he might have thought he was going to get acquitted of the murder, which is what he told his lawyer. Sure, he might have thought that. But you've got to be able to go to trial to get acquitted. You certainly will be convicted if you No, but he could have concluded the rational outcome was plead guilty to the robbery because they've got me dead to rights on the robbery. So get the lowest sentence you can on the robbery. If they do charge me on the murder, I'll go to trial and I'll get acquitted. And then I will get released in my early 50s. Well, Your Honor, I really think that that outcome that you just described is guessing. It's looking at what could happen without pointing to what the evidence in the record really was. That is a pie in the sky best case. But Mr. Yelazarov had the more realistic, what do I have to lose if I'm going to And certainly plenty of clients say 30 years life, who cares? A lot of lawyers need to talk to their clients about why that's not necessarily true. But if he knew he was looking at 50 years, why not go to trial? Apparently, many of the witnesses would have been the same. It's clear that it was very important to Mr. Yelazarov to challenge the credibility of these witnesses. And sometimes you go to trial, not because you think you're going to win, but because you've got a point to make. And that might have been what his purpose was. What was the point? To challenge the credibility of the cooperating witnesses. Can I ask you a question about a slightly different topic? Tell me about how you get around the waiver of appeal on the sentencing issue. Two ways. The first is that the resentencing occurred because Mr. Yelazarov was actually innocent of one of the offenses. So that takes it out of most of this court's appeal waiver cases to begin with. Where there is a change in sentencing law, that is a very different situation from where there is a change in the substantive law about whether someone is guilty or innocent. Well, then how do you get around the fact that he signed this plea agreement that said I get 30 regardless of what happens to the 924 charge? Well, that you get around with the fact that he signed this plea agreement based on ineffective assistance of counsel. So you have to go back to the ineffective assistance. So let's bracket that. Let's assume I agree with you that if he had ineffective assistance of counsel at the plea agreement, the waiver is invalid. But bracket ineffective assistance of counsel. How do you get around it if there wasn't an effective assistance of counsel? I think that, well, first of all, there's a couple reasons. The actual innocence of 924C is a huge factor. But he doesn't currently have a sentence for the charge for which he's actually innocent. The case you cite is a case that says in a situation where a charge you've been sentenced for is a charge of which you are now actually innocent, we don't impose the appeal waiver. But as he is before us today, he has not been sentenced for any charge for which he's actually innocent, right? He's not been sentenced on a 924C count.  So what case says you can get around the appeal waiver in that situation? The appeal waiver was in a document that he signed that included the 924C. And that, as Judge Gibney said, that expressly referenced the possibility of exactly what happened here. It did, but these contracts have to be construed against the drafter or against the government. Which is why the government put in a clause like this that says, if this happens, the waiver is still valid. And your client signed a contract that said, if this happens, the waiver is still valid. Well, we've got a situation where these, I know you said to bracket the two, but they're so tightly connected that to separate these out, he wouldn't have been resentenced without a 2255 being granted at all. Granted, the 924C 2255's in a slightly different position than the one that I'm otherwise mainly talking to you about. But something happened in that plea on several levels that was kind of problematic. And so as a result, the document, that plea waiver that contemplates the 924C, it's not worthy of the same consideration that this court would normally give plea waivers. So even if we agree with you that there's not been a waiver, how do we get around this court's opinion in Withers? I understand your argument to be that the sentence was unreasonable because it was different from the sentence of the co-defendants or the co-conspirators. But Withers says we don't consider that. So that's only one of the aspects of the unwarranted disparity. There's also an unwarranted disparity on other individuals who are resentenced after having a 924C vacated. And it's, I mean, brandishing 924C, everyone knows, is seven years. And so to not account for that in the explanation and ultimately- A charge is dismissed? I couldn't find a case that said that. There's not. The same sentence could be imposed. So how is the sentence unreasonable? It's procedurally unreasonable because of the failure to explain that particular 3553. Well, for crying out loud, this man went out and robbed a bunch of guns from somebody that he clubbed over the head, then took a man, kidnapped him, locked him in his car, went and robbed a store, and then left him to die in his trunk. How much more explanation do you want for 30 years? Well, Your Honor- I realize the Fourth Circuit second-guesses opinions a lot, but this is one that just cries out for a long sentence. Your Honor, I hear you. And I am not saying that a five-year sentence is appropriate by any means. I think that what you were alluding to is a question of the substantive reasonableness as opposed to the procedural reasonableness. Well, you're saying that she didn't explain it enough. I say that the facts explain it plenty clearly, and she said it was a horrible crime and he got 30 years for it. Again, I do hear you. That is a circumstances of the offense aspect of 3553 and is different from- So you're saying there's a checklist of things you have to say? To a certain extent, yes. As a district judge, I can say that that's a problem. I understand, Your Honor. I see that my time is up. Thank you. You'll have some time on rebuttal. Mr. Budlow. Good morning. May it please the court, Your Honors, my name is Paul Budlow, and I'm here on behalf of the government. The district court properly found that the defendant had effective assistance of representation, and counsel gave him sound advice when counsel came to him and told him that he was the target of a wholly unrelated years-old cold case homicide. And he said, I already know about that. I'm not interested in a global plea even though the government never offered one. I'm not worried about it, and they're never going to be able to prove it. That's what he said. Mr. Budlow, can I just ask you something that's been driving me crazy ever since I read the briefs in this case? Why did the government drop this, what I'll delicately call, neutron bomb on defense counsel 10 days before the plea hearing on the robbery charge? Like, it's hard to escape the inference that the reason you tell his robbery lawyer this is that you think it has something to do with the robbery lawyer's job. I don't know. Otherwise, I don't literally know why you tell the robbery lawyer this. Sure. And, Your Honor, I was trial counsel below, so I'm going to try to stick with what is in the record. Interesting. In the joint appendix. I would state that the government represented below and does here today. The government was under no obligation. So why did you do it, ma'am? Well, hindsight, right? So at the time that the plea negotiations were going on, and this is in the trial court's opinion, the investigation was covert. It was sensitive. It was an old homicide. It was not something that the government wanted the defendant or anyone else to know about. At the time the defendant signed his guilty plea, things had changed enough to where the government was comfortable revealing that information to the defense and then informed the defense essentially to avoid later litigation that the defendant would say, I didn't know about this. I would have never pleaded guilty had you not told me this. Which not necessarily would have been valid, and maybe hindsight, the government could have not done it. We'd still be fighting this battle either way, but that was the calculation was get it out there on the table. And what did you expect the lawyer to do? I expected the lawyer to do exactly what he did in this case, which was particularly effective, which was go to his client and tell him about it, and then we would see what would happen. It was clearly outside the scope of the attorney's representation of the defendant. So was he correct that the attorney-client privilege would not have covered his notes? I don't know that he was correct about that, Your Honor. I mean, certainly in the 2255 context, there are situations like this case where down the road, the attorney-client privilege is waived. I don't know that Mr. Warburg was correct. Well, I don't think he was saying that attorney-client privilege would be waived. I think he felt it wouldn't cover it at all, and that's why he was concerned and didn't take notes. He didn't further investigate. He had a conversation, but he didn't go any further, and that's – was that proper? I'm sorry. To be clear, Your Honor, two different questions in there. Was he correct that there was an attorney-client privilege? I don't know the answer, but that – he didn't indicate that the reason he did nothing further had anything to do with the attorney-client privilege. His testimony on that was he didn't take more notes because he was concerned with that, and obviously the notes that he discussed at the hearing were quite revealing. The defendant indicated that he already knew about the investigation. He provided names of two people. It was a bit vague, but it seemed to be that he knew that they knew about the investigation. Well, but he – didn't he say that I didn't go into this any further because I was concerned – I didn't take any notes about it because I was concerned that my conversation at that time with the client was not protected by the privilege? Yes. And that's hogwash, isn't it? Every time you talk to your client and the client asks you for legal advice, that's protected, isn't it? I would absolutely think so, Your Honor. Yeah. But he did say that's why he didn't take notes. He did not say that that had anything to do with his reasons for not investigating. His reasons for not investigating were essentially two- or threefold. One, the government said you're not getting any more information than this very limited information, which was there's this serious case. It's a homicide. The government thinks the case is strong. Your client is likely to be indicted, and it has nothing to do with this case. We're not interested in a global plea. Then he went to his client. His client said, I know about it. I'm not interested in it. And then he said the government essentially stonewalled him. So his testimony as to why he did not investigate, which there's no obligation in professional norms, in any case law, anywhere that was presented below. There was no expert testimony. There was no evidence below at all that there's a professional norm or obligation to investigate wholly unrelated case that had no consequence in this case. Although Mr. Elizaroff specifically said that he would be out in his 50s and that was important to him and that, therefore, he would be in prison for no longer than 30 or around 30 years. He was in his 20s and accepted the plea on that basis. And so would he then I mean, is there a question about whether he would have accepted the plea had he known that these charges were serious? Well, I believe that the testimony you're referring to is at the ineffective assistance of counsel stage when the defendant testified that he thought he rebounded his 50s. But I think the record is crystal clear, regardless, that the defendant had a complete knowledge of this. He alleged below and all of his pro se filings through his attorney. And again, here on appeal, really the gravamen of this case is that he was told that if he pled guilty in this case, that would foreclose any further prosecution. But the trial court held a hearing two days, three witnesses and made specific findings, completely finding that that was not true. The trial court found at Joint Appendix 504 through 510 that Mr. Waldman did tell the defendant about the investigation and all of the things that we've heard today about what the defendant said. I'm not interested. They can't prove it. I'm not interested in a global plea. But critically, what the trial court found was that Robert Waldman told the defendant about the consequences of the guilty plea in this case and that they did not preclude a future murder prosecution. Not only that, the court found that it happened twice. So at the initial time when they learned about the homicide investigation, then the defendant withdrew from that guilty plea, directed Waldman to get him additional counsel for a second opinion, which he got. Then the defendant came back to Waldman, initiated plea negotiations again. And then Waldman, when he brought him the final plea agreement, advised him for a second time, as found by the trial court, that he said this would be a good time to remind him that a guilty plea in this case would not preclude a future murder prosecution. And additionally, on the same point of his notice and how that issue is foreclosed, the trial court found that the plain text of the plea agreement was inconsistent with the defendant's claim that he could not be prosecuted. So both the plea agreement itself and the Rule 11 colloquy made it clear the defendant was fully aware that the plea agreement related just to this case. This court really should decline to impose an obligation on defense attorneys that it has never imposed, that exists in no standards, no professional norms. Namely, that a defense attorney has an obligation to investigate and even attempt to resolve an unrelated criminal investigation that's not part of the case. And further, that this obligation somehow exists in a situation like this where the client says, I already know about the unrelated conduct. I'm not interested in it. I don't want to plead to it. But I do want to plead to this case. How would you advise us to distinguish Aguilar, the DC Circuit case? Your Honor, Aguilar involved an attorney advising his client in rejecting a plea agreement in the face of additional 924Cs that would clearly stack. That had consequences inside that case, and it involved conduct inside that case. And this speaks to a point that Your Honor questioned petitioner's counsel about earlier. That is inopposite here because unlike that case, the conduct that's being complained of here is outside of the case. So the defense is claiming that Mr. Wolman should have done something having nothing to do with this robbery. And when we say outside the case, I'm just trying to make sure I understand what we mean by outside the case. Do we mean it's different in time? What if the indictment in this case, I mean, this is going to be a weird set of facts, but what if the indictment in this case did not charge a murder but alluded to the circumstances that might have supported a murder charge? What do you think the answer would be then? Because as I recall, one of the things I think I remember the DC Circuit saying in Aguilar is like, you just have to look at the initial indictment. The initial indictment makes clear you could be charged with other 924C offenses. Right, and in this case, what Mr. Wolman was presented with is that he was engaged, his scope of representation was for a conspiracy that spanned between 2012 and 2013. It involved a conspiracy to rob guns and jewelry stores and to kidnap people. How do I know that's the scope? Is that because of his representation agreement? Is that because of the indictment that he was defending? When you say, yes, you just represented what the scope of his representation is, how do I know what the scope of his representation was? At joint appendix 18 and 19 is the first two pages of the indictment. Mr. Wolman was appointed after the indictment. He was appointed to represent the defendant in that case. And in that case involved conspirators and this six-month conspiracy. On the other hand, the murder case that he was informed about, that he was – information he knew and he could make this decision is somehow related, was a homicide. It was 2009, and it was in a situation where the defendant acted alone. And I believe Mr. Wolman testified at the 2255 hearing about whether or not there were other co-conspirators because he smartly asked that question to see if there was not just a global plea but potential cooperation. And he was informed that the defendant acted alone. So here we have a case that's separated by time, many years. It's separated by conduct. One is robbery and kidnapping. The other one is a murder that was for revenge. And I'd remind the court that – So did you prosecute the murder case? I did. Did any of his co-conspirators testify in that? No. He pled guilty on the first day of trial. Were any of them witnesses, to be witnesses in that? I'm reluctant to answer the court's question with respect to cooperators, Your Honor. I could certainly provide that information after the hearing under seal. Well, you probably just didn't. Yeah, maybe. Didn't Mr. Waldman himself testify that he could have done an investigation? So if he could have done an investigation, wouldn't he be obliged to do so? No. I mean, Your Honor, respectfully, there's lots of things counsel could do that fall in the wide range of possible conduct from a defense attorney when representing a defendant. But here he was representing the defendant in a plea discussion where his client told him that one of the reasons he was accepting the plea was because he wanted to be out in his fifties. So they were having a conversation about the plea agreement. Counsel, Mr. Waldman, knew that there was this other potential indictment that would cause his client to be in prison far longer than the agreement called for, and yet he failed to investigate when he knew he could. Well, it's completely unrelated. Again, the government would ask the court not to expand the scope of representation and impose an obligation on every defense attorney who has representation for the client in one case to represent other cases. But the other thing I'd note, Your Honor, is that what Mr. Waldman was faced with did not give rise to an ability to get any or much information at all, particularly when the government had stonewalled him. It was an old case that was closed. There was no discovery obligation. And his client looked at him and said, I know about it, I know more than you do, and I'm not interested. And so under those circumstances, Mr. Waldman had no obligation to pursue this completely unrelated investigation. His obligation, which I think he did, was two things. One, he told his client exactly what the consequences would be of the plea and of the future murder prosecution, and he negotiated the plea agreement in this case that his client asked him to do. His client said, Get me a better plea. And at the time, he had signed a plea where the government could ask for 40 years. He came back with a second plea after getting a second opinion with a plea agreement that was a C plea to 30 years. But more importantly, it was also agreed that it would run, or the government agreed not to oppose, that it would run concurrent to an 11-year sentence the defendant was currently serving. The guidelines were over 30 years. So this was a plea agreement that was 30 plus, right? Well, they were 30 plus at the second sentencing. But at the original sentencing, they were higher. So this original sentence that Mr. Wallman negotiated was far below the guidelines. Then when it came to Judge Hollander at the resentencing, the guidelines were recalculated and they were 30 to life. Again, the government would argue that this also was a below-guideline sentence. And it was a Part C plea. It was a C under Rule C-1C. The court could not have changed it, could not have gone, the court could have rejected the plea. That was the government's argument below, but in looking at the court's rationale in the sentencing hearing in this case, Judge Hollander did not accept the argument that Judge Hollander was bound by the C plea agreement. And like she would do in a C plea agreement, she engaged in a full colloquy and hearing and provided reasons and reached the 30-year sentence on her own for other reasons, some consistent with the government's memo, but other reasons other than the fact that the C plea called for it. She did consider, however, the fact that the defendant had agreed to it, and that was one of the factors that Judge Hollander did consider. Your Honor, turning to the sentencing in this case, the district court properly sentenced the defendant to 30 years' imprisonment, which was precisely the sentence that he bargained for. And as Your Honor, Judge Gibney noted earlier, the government's view is this court should dismiss this sentencing appeal because the defendant signed a Rule 11C1C plea agreement that the defendant was sentenced consistent with, and he agreed in that plea agreement to waive his right to appeal the sentence on whatever grounds. And so this court should dismiss that appeal based on the appeal waiver. But even if the court were to address the merits of the defendant's appeal on sentencing, the court should affirm because the sentence was both procedurally and substantively reasonable. I would like to address the waiver a bit more, Your Honor. There are a couple of cases cited by the defense, Adams and McKinney, that were both situations where this court declined to enforce an appeal waiver relating to a 924C charge. As Your Honor, Judge Hayden's reference, though, both of those cases involved a 2255 and a motion to vacate the sentence. In this case below, the government agreed with the 2255, and the sentence was vacated and the defendant was resentenced. So the sentence, the 30-year sentence before Your Honors today when evaluating the waiver, has nothing to do with the 924C conviction whatsoever. Because the sentence on 924C is currently zero, right? It is exactly zero. There's no conviction on 924C. And so Judge Hollander, using the sentencing package doctrine and engaging in a holistic approach, sentenced the defendant to 30 years on Counts 1 and Count 4, which is precisely what the plea agreement said. And to put that in a bit of context, when this first plea agreement or when the second plea agreement was enforced and the defendant pled guilty, the parties were very much aware of the changing landscape in the law of 924C and which statutes were and were not predicates. But the parties reached an agreement that 30 years would be the sentence in this case, squarely looking at that uncertainty and trying to come up with a way that would say, even if 924C is reversed, you're going to come back and get resentenced. It's going to be 30 years. You're going to get the finality you want. The government's going to get the finality they want. And the appeal waiver is going to make it clear that it doesn't matter what happens to the 924C. And so unlike those cases in Adams and McKinney, not only are we in the situation where those were vacating, but there's a notice issue as well. Here the defendant was completely unnoticed. He overtly and expressly anticipated that we would be in this exact situation. The defense also alleges that there's a procedural unreasonableness because the trial court didn't address the disparity in sentencing. The trial court did address disparity in sentencing. At joint appendix 823 to 824, the court specifically referenced that she had done a lot of research. She mentioned a number of sentences that she had imposed and sentences she had reviewed in the compassionate release context. And she mentioned sentences of other judges. So the trial court was making it clear that as part of the 3553A analysis, the court considered A6 relating to sentencing disparities. What counsel argues for in this case for sentencing disparities is not the sentencing disparities as anticipated under 3553A. As this court held in United States v. Mosley, sentencing disparity does not apply within the case between co-defendants, but instead applies nationwide. And that's essentially what the trial court was doing here. The other point is that there is no sentencing disparity between co-defendants in this case because, as this court mentioned, the conduct that the defendant was the leader of was extremely serious, violent, well-planned conduct. He's the only leader. The defendant is the only person of this group with a criminal history that includes the execution-style homicide of Wayne Reuter. So there is no defendant similar. And 3553A6 says that the court should avoid unwarranted sentencing disparities among defendants with similar records. There's none here. And who have been found guilty of similar conduct. There's none here. Now the defense has another creative argument that disparity wasn't covered because the court didn't properly address the reasons for imposing the same sentence for the vacated 924C conviction. Again, the court did, but I would start by saying that that is not what 3553A6 covers. It doesn't cover defendants who are in similar procedural posture. It discusses defendants with similar records and similar conduct. And as the district court noted below, upon remand, the court can use the sentencing package doctrine to sentence the defendant with the remaining counts consistent with 3553A. And the court is also to consider the defendant as he is at the time of sentencing, which is exactly what the district court did here. The district court referenced the sentencing package doctrine. The court recognized that it was engaging in a holistic approach and that the final sentence was part of a larger plan. And the court said that the court was not required to reduce the sentence by 84 months, but did consider the defendant's request. So there was no procedural error relating to the defendant receiving the same sentence upon conviction. Your Honor, I see my time is up. Unless the court has further questions for me, I'm prepared to sit down. Thank you very much. Thank you. Ms. Skelton, you have some rebuttal time. Before you get into that, I just have one question I wanted to ask you, which is this, I understand I'm going to be out at 50, stuff that we've been talking about. Am I correct that that was his testimony at the 2255 hearing, not when he was sentenced? No, that was when he was sentenced to begin with. What is the JA cite for that proposition? One moment, Your Honor. Okay. So just to be clear, my understanding is that he testified to that at the 2255 evidentiary hearing, but that he did not say that at the Rule 11 colloquy, and that he did not say that at the time of his original sentencing. I'm sorry, my transcript notes were before the JA. The sentencing, April 13th, 2016, page 13 of that sentencing, and I'm not quite sure what the JA is. That's fine. That is where actually it's Mr. Waldman who says that he will be out in his 50s, and the sentencing memo that he filed before the sentencing also says the same thing. Okay. Thank you very much. Go ahead. Your Honors, something I kind of want to make clear with respect to the portion of the plea agreement that talks about whether, you know, what is precluded for prosecuting later. We are not standing here today saying that the government breached its plea agreement in the robbery case by prosecuting the murder case. We are not saying that that plea agreement precluded that prosecution, which kind of goes to the prejudice. We're not saying that the murder case was off the table. That's really not where the prejudice is here. It is, Judge Haytens, I think what we were talking about, where we really are focusing on what is the prejudice in the robbery, and that prejudice is would he have gone to trial or not, not whether he would be prosecuted later or not. I hope I'm not confusing things by bringing that up, but the validity and the counsel's understanding of that paragraph, and I think counsel's understanding of that paragraph was a little confused, which is troublesome, but that goes to what his advice was in the robbery. I also just, I understand what Mr. Budlow was saying about not asking this court to impose additional obligations on defense counsel to investigate things that are just out in left field, but the four corners of the indictment cannot possibly be the limitations of what defense counsel's obligations are, because that is always the smallest bit. What if the case went to trial and there was 404B evidence lurking out there and counsel was totally blindsided? That would be bad, and that's obviously not going to be in the indictment. The indictment is a starting point, but if that is it, then there's a real problem. Counsel has to go beyond those minimal. And what would the limiting principle be then? Well, the limiting principle, I'm going to- I just struggle with how this rule would be written. I understand, and I'm afraid my answer might dance around it, but at least the fact that the prosecutor told the defense counsel in this case shows that whatever the limiting principle is here, broader here, the murder falls within the limiting principle. But wait, that's not right, because imagine that the original- keep everything about the same except the original charge is securities fraud. Everything is the same except the original charge is securities fraud, and so then the government says, by the way, before you do this plea to the securities agreement, just FYI, your client's about to get indicted for a murder. You say that the securities fraud lawyer has to investigate the murder? Has to probe. Doesn't have to solve the case, but has to- Goodness, I don't think I'd want a typical securities defense lawyer investigating a murder. No, and perhaps at that point what the obligation really is is to go to the judge, maybe have an under seal status conference and say, I think we need a minute. I think he needs another lawyer. I don't think I can advise on what's happening here until we get a little bit more information. And so it's not necessarily that the securities lawyer has to do everything for the murder, but has to take enough steps so that the defendant knows what's up. Thank you, Ms. Skelton. Thank you. I noticed that you were court appointed, is that correct? It's correct. Well, it seems particularly appropriate during public defense week to thank you and recognize you for your work in this case. We very much appreciate it. We could not do our jobs without the help of people like you, so thank you very much. Thank you very much, Your Honor. We will come down and greet counsel and go directly to our second case.
judges: Toby J. Heytens, Nicole G. Berner, John A. Gibney Jr.